AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**6/3/2021**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ JB ___ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

**06/02/2021**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ dj ___ DEPUTY

| | |
|---|---|
| United States of America<br><br>v.<br><br>OSCAR BELLO TORRES and<br>ERIC CATALAN,<br><br>Defendant(s) | Case No.    2:21-mj-02718-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of February 10, 2021, in the county of Santa Barbara in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1); (b)(1)(A) | Distribution of Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_/s/ Christopher Stantzos_
*Complainant's signature*

Christopher Stantzos, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    June 3, 2021

_Louise A. LaMothe_
*Judge's signature*

City and state:    Santa Barbara, California

Hon. Louise A. LaMothe, U.S. Magistrate Judge
*Printed name and title*

AUSA: Maria Elena Stiteler (x6148)

## <u>AFFIDAVIT</u>

I, Christopher Stantzos, being duly sworn, declare and state as follows:

### I. <u>PURPOSE OF AFFIDAVIT</u>

1. This affidavit is made in support of a criminal complaint and arrest warrants against Oscar Bello TORRES ("TORRES") and Eric CATALAN ("CATALAN") for violations of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance.

2. This affidavit is also made in support of an application for warrants to search:

     a. The premises located at 1029 East Gutierrez Street, Santa Barbara, California 93103, as described further in Attachment A-1 ("SUBJECT PREMISES 1");

     b. The premises located at 1212 Punta Gorda Street, Space 13, Santa Barbara, California 93103, as described further in Attachment A-2 ("SUBJECT PREMISES 2");

     c. A black 2008 BMW 1-Series bearing California license plate number 7EAY511, as described further in Attachment A-3 ("SUBJECT VEHICLE");

     d. The person of Eric CATALAN ("CATALAN"), as described further in Attachment A-4; and

     e. The person of Oscar Bello TORRES ("TORRES"), as described further in Attachment A-5.

3. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of, and possession with intent to distribute, controlled substances) and 21 U.S.C. § 846

(conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, A-3, A-4, A-5, and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF SPECIAL AGENT CHRISTOPHER STANTZOS**

5. I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have been for one year. I was hired by ATF in March 2020 and attended the ATF Academy from March through December 2020, where I received approximately 1,000 hours of formal training in various aspects of conducting firearms, explosives, arson, firearms trafficking, and gang investigations. Before joining the ATF, I was an Intelligence Analyst ("IA") for the Federal Bureau of Investigation ("FBI") for approximately four and a half years. As an IA, I produced intelligence products in furtherance of civil rights investigations and complex international money laundering investigations. Before joining the FBI, I was a

2

forensic scientist for the Washington, DC Department of Forensic Sciences for nearly two years, where I identified, documented, preserved, and collected physical evidence from crime scenes.

6.   I have participated in many aspects of gang, firearms, and drug investigations, including undercover operations, arrests, and surveillance.  I have also debriefed multiple informants and witnesses who had personal knowledge regarding illegal firearms and drug trafficking.  I am familiar with firearms and drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs, as well as the collection of money proceeds of drug-trafficking and money-laundering methods used to conceal the nature of the proceeds.  I am familiar with the methods employed by gang members to thwart detection by law enforcement including the use of cellular telephone technology, counter-surveillance techniques, false or fictitious identities and addresses, money-laundering techniques, and coded language.

7.   Currently, I am assigned to the Los Angeles Field Division, Santa Maria Satellite Office ("SMSO") of the ATF.  I have been assigned to the SMSO since March 2020, in which time I have participated in controlled purchase operations, undercover operations, and gang investigations in Los Angeles, Santa Barbara, and San Luis Obispo Counties.

### III.  SUMMARY OF PROBABLE CAUSE

8.   In January and February 2021, the ATF and the Santa Barbara County Sheriff's Office ("SBSO") identified CATALAN as a distributer of methamphetamine in the Santa Barbara and Lompoc,

CA areas.  The ATF and SBSO further identified CATALAN's methamphetamine supplier as TORRES, a pound-quantity methamphetamine dealer for the "Krazies," a criminal street gang affiliated with the East Side Santa Barbara street gang in Santa Barbara, CA.  On January 13, 2021, an undercover ATF confidential information (the "CI") purchased approximately 80 grams of methamphetamine from CATALAN.  On February 10, 2021, the CI purchased approximately 408 grams of methamphetamine from TORRES, who was enlisted and assisted by CATALAN.  And on February 22 and March 2, 2021, the CI purchased approximately 328 grams and 534 grams, respectively, of methamphetamine from TORRES.

9.    Through these multiple, recorded, undercover purchases, law enforcement determined TORRES resided at SUBJECT PREMISES 1.  For two of these purchases, TORRES carried the methamphetamine from SUBJECT PREMISES 1 to the location of the purchase.  Law enforcement further determined that TORRES operated the SUBJECT VEHICLE for personal use and to store methamphetamine.  Further, during a recorded methamphetamine transaction in March 2021, TORRES explained that he used a residence in the area of the 1100 Block of Punta Gorda Street, Santa Barbara, CA 93103, as a "trap pad" -- a stash house used to store drugs and other contraband.  Through surveillance of TORRES and the SUBJECT VEHICLE, in April 2021 law enforcement determined the "trap pad" was SUBJECT PREMISES 2, which TORRES is currently visiting on a near daily basis.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.  Based on my review of law enforcement reports, conversations with other law enforcement officers, and my own knowledge of the investigation, I know the following:

### A.   Identification of CATALAN as Source of Illegal Drugs

11.  On January 2, 2021, at ATF Special Agent Bryan Traverso's direction, an ATF CI[1] called a target of a drug investigation with initials C.S.  In that call, which was recorded and which I have reviewed, the CI asked C.S. how much a "p" of "broken window" would cost.  From my training, experience, and conversations with senior law enforcement officers, I understand that this is coded language that refers to a pound of methamphetamine.  C.S. stated that he would get on that, and that the CI could buy it in Lompoc, California.

12.  On January 4, 2021, at SA Traverso's direction, the CI called C.S.  During this call, which was recorded and which I reviewed, C.S. and the CI agreed, in substance and in part, on a $3,200 purchase price for a pound of methamphetamine, which the CI could purchase from C.S.'s associate.  C.S. told the CI that he would send his supplier's "snap" (Snapchat contact information).

---

[1] The CI has provided reliable, credible, and actionable intelligence that ATF corroborated through independent ATF investigations.  In 2015 the CI was charged with federal racketeering conspiracy, drug, and firearms violations, to which he has since pleaded guilty.  The CI is cooperating with the ATF for consideration in the federal case and financial compensation.

13.  Also on January 4, 2021, C.S. sent the CI a series of Snapchat messages.[2]  Due to the encrypted nature of Snapchat communications, agents were unable to document all portions of the January 4, 2021 Snapchat conversation between the CI and C.S.  However, I have reviewed the portion of the conversation that was saved, and it shows that C.S. sent the message "3200" to the CI (referencing the price of a pound of methamphetamine) and then provided the CI with a Snapchat profile labeled "Eric Catalan."  From my review of the CI's communications with C.S., I understood that C.S. identified "Eric Catalan" as a supplier of methamphetamine.

### B.   January 13, 2021 Purchase of Approximately 80 Grams of Methamphetamine from CATALAN

14.  On January 4, 2021, at SA Traverso's direction, the CI messaged the Snapchat contact for "Eric Catalan" that C.S. had provided.  Due to the encrypted nature of Snapchat communications, agents were unable to document all portions of this Snapchat conversation; however, the saved portion of the conversation shows that the CI asked "Eric Catalan" "What's your digits I'll get at you right now."  As I understand from a conversation with SA Traverso, the CI told SA Traverso that the CI and "Eric Catalan" exchanged telephone numbers in the portion of the Snapchat conversation that was not preserved.

---

[2] I am aware from my training and experience in computer and digital investigations that Snapchat is an encrypted multimedia messaging application in which users can share text, audio, video, and picture messages that typically disappear shortly after viewing.

15.   After this Snapchat conversation, the CI called the telephone number that "Eric Catalan" provided, which was (805) 757-6328.  In that call, which was recorded and which I have reviewed, CATALAN picked up the call and answered "yes" when asked if he was "Eric" (CATALAN's first name).  The CI then referenced his/her earlier conversations with "homeboy" (C.S.) and asked if they could conduct the deal on Thursday (January 7, 2021).  CATALAN stated he had already told his "connect" that the CI needed the narcotics by that night (January 4, 2021).  In substance and in part, CATALAN then agreed to sell the CI one pound of methamphetamine for $3,200 on January 7, 2021.  CATALAN additionally asked the CI how much the CI had been getting "it" (one pound of methamphetamine) for.  The CI stated he/she could get a pound of methamphetamine in Los Angeles for $2,800.

16.   On January 7, 2021, at SA Traverso's direction, the CI called and sent text messages several times to CATALAN at phone number (805) 757-6328.  During the documented conversations, which I have reviewed, the CI canceled the planned narcotics deal on January 7, 2021, and the CI and CATALAN agreed to talk again over the weekend.

17.   On January 9, 2021, CATALAN called the CI from phone number (805) 757-6328.  During the recorded conversation, which I have reviewed, CATALAN and the CI agreed to conduct their prearranged narcotics deal on January 14, 2021.  CATALAN stated he needed to have his "connect" drop the narcotics off with him.

18.   On January 12, 2021, at SA Traverso's direction, the CI called CATALAN at phone number (805) 757-6328.  During the

recorded conversation, which I have reviewed, CATALAN and the CI arranged to conduct the narcotics deal during the night of January 13, 2021, and CATALAN agreed to have his connection bring the methamphetamine to Lompoc, CA.

19.  On January 13, 2021, CATALAN initiated a series of recorded phone calls and text message conversations with the CI, via phone number (805) 757-6328.  During the conversations, which I have reviewed, CATALAN stated his connection was "feeling iffy" because of the two previous canceled deals. CATALAN stated his connection did not want to drive up to Lompoc with the narcotics.  The CI then inquired whether CATALAN had any drugs to sell.  CATALAN replied he could sell the CI three ounces of methamphetamine for $300 per ounce, two ounces of which CATALAN had already weighed.  CATALAN further stated he had a "bunch of dope that is miscellaneous in different baggies" and that "most of it's junk."  The CI and CATALAN agreed to conduct the deal for three ounces of methamphetamine later that night.  CATALAN later provided his address by text message as an address on Q Street in Lompoc, CA.

20.  After speaking with ATF SA Bryan Traverso, SBSO Detective Robert DeBarge, and reviewing the audio and video recordings of the deal, I learned the following series of events from January 13, 2021:

a.   On the evening of January 13, 2021, the CI met SA Traverso and ATF SA Ricky Chan at a predetermined meeting location.  At the location, SA Traverso and SA Chan searched the CI and the CI's vehicle for contraband, with negative results.

Next, SA Traverso and SA Chan equipped the CI with an electronic monitoring and recording device.  SA Traverso then provided the CI with government funds to purchase the methamphetamine from CATALAN.

b.   After providing the CI with government funds to purchase the methamphetamine from CATALAN, SA Traverso directed the CI to go to CATALAN's residence.

c.   The CI then exited the predetermined meeting location and proceeded to CATALAN's residence.  At the same time, SA Chan and SA Traverso followed the CI from the predetermined meeting location to CATALAN's residence.  Once the CI arrived at CATALAN's residence, SBSO personnel continued to maintain visual surveillance of the CI.

d.   Upon arriving at CATALAN's residence, the CI contacted CATALAN via a recorded phone call to phone number (805) 757-6328 and informed CATALAN he/she was on CATALAN's block.  From listening to the recording, I learned that CATALAN confirmed his residence was the corner unit and, after a few moments, came to the CI's vehicle.  CATALAN then handed approximately 85 grams of methamphetamine to the CI and the CI provided CATALAN with $900 in government funds.

e.   From reviewing the recording of the deal, I heard CATALAN state that he just got out of prison (for a year) and did his time in Santa Barbara County Jail.  CATALAN further stated he knew people who made firearms and agreed to sell the CI firearms in the future should CATALAN get any.  CATALAN stated he had a "homie in Arizona" and could get "ARs and AKs"

9

for $600, while selling them in California for $1,500.  CATALAN
then stated he knew someone who was selling an AR-style rifle
recently.

       f.   Shortly after this, the CI drove away from the
area of CATALAN's residence.

       g.   After the CI left the area of CATALAN's
residence, SA Traverso and SA Chan followed the CI back to a
predetermined meeting location.

       h.   At the meeting location, SA Traverso took
approximately 85 grams of methamphetamine from the CI and placed
it into ATF custody.  After this, SA Traverso recovered the
electronic monitoring and recording devices from the CI.  SA
Chan and Detective DeBarge searched the CI and CI's vehicle for
additional contraband with negative results.

21.  On January 16, 2021, I showed the CI two images of
CATALAN, which I obtained from Santa Barbara Sheriff's
Department.  The CI identified CATALAN as the person from whom
he/she had just purchased the methamphetamine.

       a.   DEA Southwest Laboratory testing has confirmed
that the CI purchased approximately 80 grams of methamphetamine
from CATALAN.

      **C.    February 10, 2021 Purchase of Approximately One
           Pound of Methamphetamine from CATALAN and TORRES**

22.  On January 14, 2021, at SA Traverso's direction, the
CI called CATALAN at phone number (805) 757-6328.  During the
recorded conversation, which I have reviewed, CATALAN and the CI
discussed the CI purchasing a pound of methamphetamine from

CATALAN in the future.  The CI then asked CATALAN to let him/her know if CATALAN came across any firearms to sell, which CATALAN agreed to do.

23.  On January 27, 2021, at my direction, the CI called CATALAN at phone number (805) 757-6328.  During the recorded conversation, which I have reviewed, the CI asked if he could purchase a pound of methamphetamine from CATALAN in Santa Barbara, CA, the next day (January 28, 2021).  CATALAN stated his methamphetamine supplier was asking about the CI recently. CATALAN then agreed to conduct the transaction on the afternoon of January 28, 2021.

24.  The next day, on January 28, 2021, at my direction, the CI called and sent several text messages with CATALAN at phone number (805) 757-6328.  During the documented conversations, which I have reviewed, the CI asked CATALAN if the price of a pound of methamphetamine was still $3,200, to which CATALAN replied it was.  CATALAN and the CI then agreed to meet in Santa Barbara, CA around 3:00 p.m. that day to conduct the narcotics transaction.  A few hours later, at my direction, the CI attempted to contact CATALAN via recorded phone calls and documented text messages to set up the deal; however, CATALAN did not respond.  After this, the CI informed me of the phone and text message conversations with CATALAN.  I then directed the CI to cancel the planned narcotics transaction.

25.  After the CI cancelled the planned deal, the CI received a call from CATALAN at phone number (805) 757-6328.  In that recorded call, which I have reviewed, CATALAN apologized to

11

the CI and claimed, "shit has just been cracking," and took responsibility for the deal falling through.  CATALAN offered to go pick up the methamphetamine from his supplier and drive it to the CI, but then stated he was about to go to Anaheim, CA.  The CI then asked CATALAN if he heard anything about firearms for sale, to which CATALAN stated there were "two AR-15s with drum clips" available three to four days ago.  CATALAN further stated both of the firearms were selling for $3,000.  The CI inquired if the firearms were still available and CATALAN stated he would call his associate and check.

26.  On February 1, 2021, at my direction, the CI called CATALAN via phone number (805) 757-6328.  During the recorded conversation, which I have reviewed, CATALAN stated he had not heard from his associates about the previously discussed AR-15s.  The CI and CATALAN then discussed conducting another narcotics transaction for a half pound of methamphetamine in the Santa Barbara or Goleta area, with the CI suggesting they go straight to CATALAN's methamphetamine supplier to pick up the narcotics.

27.  On February 8, 2021, at my direction, the CI called CATALAN at phone number (805) 757-6328.  During the recorded conversation, which I have reviewed, the CI and CATALAN agreed to conduct a narcotics deal on February 10, 2021.  CATALAN stated his supplier recently inquired about the CI to see if he/she was still interested in purchasing the narcotics.  The CI and CATALAN then agreed to meet in Santa Barbara on February 10, 2021, to conduct the narcotics transaction.

12

28.  On February 9, 2021, at my direction, the CI called CATALAN at phone number (805) 757-6328.  During the recorded conversation, which I have reviewed, CATALAN asked the CI if he/she was "trying to get the whole thing or what?" which I understand from my training and experience to refer to a full pound of methamphetamine.  The CI asked how much a full pound of methamphetamine would cost and CATALAN stated his supplier could sell a pound for $3,200.  CATALAN and the CI then agreed to meet the following day in the afternoon to conduct the transaction.

29.  On February 10, 2021, at my direction, the CI called CATALAN at phone number (805) 757-6328.  During the recorded conversation, which I have reviewed, the CI asked CATALAN if his supplier was still able to conduct the narcotics transaction that afternoon, to which CATALAN replied he was.  CATALAN and the CI then agreed to conduct the transaction in the Goleta, CA area.  CATALAN further stated he was in Lompoc and was "mobile," meaning he had access to a vehicle.

30.  Later that same day, at my direction, the CI called CATALAN at phone number (805) 757-6328.  During the recorded conversation, which I have reviewed, CATALAN stated his methamphetamine supplier suggested the CI and CATALAN come to him (the supplier) to pick up the narcotics.  CATALAN agreed to send the CI the supplier's address, but stated that the supplier wanted CATALAN to be present for the deal too.  Shortly after the call, in a text message conversation, CATALAN provided the address of his supplier as 1029 East Gutierrez Street in Santa Barbara, CA (SUBJECT PREMISES 1).

31.   Later on the same day, the CI received a cell phone call from CATALAN via phone number (805) 757-6328.  At my direction, the CI spoke with CATALAN.  During the recorded conversation, which I have reviewed, CATALAN told the CI to park in a location near SUBJECT PREMISES 1.  The CI then asked CATALAN if the methamphetamine supplier lived at SUBJECT PREMISES 1 and CATALAN stated that he did, but the supplier planned to come out of the residence to meet CATALAN and the CI.  CATALAN further stated SUBJECT PREMISES 1 was also the supplier's parents' home.  Following this, the CI contacted me and advised me of the phone call with CATALAN.

32.  After speaking with ATF SAs Traverso and Chan, SBSO Detectives DeBarge, Justin DiPinto, Karen McCormick, and Sgt. Neil Gowing, and reviewing the audio and video recordings of the deal, I learned the following series of events from the afternoon of February 10, 2021:

a.   During the afternoon of February 10, 2021, the CI met me, SA Traverso, SA Chan, and Detective DeBarge at a predetermined meeting location.  At the location, SA Chan and Detective DeBarge searched the CI and the CI's vehicle for contraband, with negative results.  Next, SA Traverso and I equipped the CI with an electronic monitoring and recording device.  I then provided the CI with government funds to purchase the methamphetamine from CATALAN.  Following this, Detective DeBarge equipped the CI's vehicle with a GPS tracking device.  I then directed the CI to go to SUBJECT PREMISES 1.

14

b.   Following this, the CI proceeded to SUBJECT PREMISES 1.  At the same time, SA Chan, SA Traverso, and I followed the CI from the predetermined meeting location to the transaction location.  Once the CI arrived at the location, SBSO personnel continued to maintain visual surveillance of the CI.

c.   Upon arriving at SUBJECT PREMISES 1, the CI contacted CATALAN via cell phone number (805) 757-6328 and informed CATALAN the CI was at the location.  During the recorded conversation, which I have reviewed, CATALAN identified the CI's vehicle and stated he would come to the CI.  Shortly after this, SBSO Sgt. Gowing saw CATALAN exit a green Dodge Durango and enter the CI's vehicle via the front passenger door.

d.   Based upon the recording of the deal that I reviewed, I learned that while sitting in the CI's vehicle, CATALAN stated the female in the Durango was his ride from Lompoc.  CATALAN then stated his supplier at SUBJECT PREMISES 1 was "hella paranoid" and worried about law enforcement from a previous experience.  CATALAN stated most people weren't "quick" like the CI, and that the CI was "on point."  CATALAN then stated he believed his supplier was going to leave his residence on East Gutierrez, get into his own vehicle (that is, the supplier's vehicle), and want to drive around and do a "perimeter check," before conducting the deal.  CATALAN repeated his supplier was "hella hella cautious."  CATALAN proceeded to tell the CI he was dropping off money for his supplier that day and had recently picked up drugs from his supplier.

15

33.   Following CATALAN's statement about his supplier's residence at SUBJECT PREMISES 1, SBSO Detectives conducted record checks and determined that TORRES resided at SUBJECT PREMISES 1.   We also obtained a booking photograph of TORRES for reference.   A short time later, SBSO Detective Justin DiPinto, who had reviewed a photograph of TORRES, informed me that he had observed TORRES exit from the rear of SUBJECT PREMISES 1 and enter the rear passenger-side door of the CI's vehicle with the CI and CATALAN, without stopping at any other locations or entering his own vehicle.   I then observed on the recording that the CI started the vehicle and drove a short distance from SUBJECT PREMISES 1 at the request of TORRES, who said it was "more low key."

34.   Detective Karen McCormick told me that she observed the CI drive east on Haley Street and stop at the dead end of the street.

35.   Based upon the recording of the deal that I reviewed, I learned the following:

   a.   The CI handed TORRES $3,200 in government funds, after which TORRES handed the CI approximately one pound of methamphetamine, contained in multiple plastic bags and a yellow tequila box.   TORRES proceeded to count the funds and state, "everything's good," which I observed while listening to and watching the recording.

   b.   Following this, CATALAN then stated, "this is where I exit," but he offered to play the role of middleman going forward, if needed.   CATALAN and TORRES then agreed, in

16

substance and in part, to have CATALAN provide the CI with TORRES' phone number, and TORRES insinuated he liked to conduct his deals quickly.

36.  SBSO surveillance units then observed the CI return to the area of SUBJECT PREMISES 1 with TORRES and CATALAN in the vehicle.

37.  Upon returning to the area of SUBJECT PREMISES 1, ATF SA Ricky Chan observed TORRES and CATALAN exit the CI's vehicle. SA Chan then saw TORRES walk north on Gutierrez Street back to SUBJECT PREMISES 1, while CATALAN returned to the Dodge Durango.

38.  After the CI drove away, I, along with other SAs and Detectives, followed the CI back to a predetermined meeting location.

39.  At the meeting location, I took the methamphetamine from the CI and placed it into ATF custody.  I then weighed the methamphetamine in its innermost packaging and determined it to weigh approximately 449.4 grams.  Following this, Detective Robert DeBarge conducted a presumptive field test of the purchased narcotics and confirmed it to be methamphetamine.  SA Traverso and SA Chan then recovered the electronic monitoring and recording devices from the CI.  SA Chan searched the CI and the CI's vehicle for additional contraband with negative results.  SA Traverso then showed the CI an unmarked picture of TORRES.  The CI identified the person in the picture as the person who handed the CI the methamphetamine.  I then directed the CI to contact CATALAN via text message and ask for TORRES' cell phone number, which CATALAN provided as (805) 452-7997.

a.    DEA Southwest Laboratory testing has confirmed that the CI purchased approximately 408 grams of methamphetamine from TORRES and CATALAN.

**D.    February 22, 2021 Purchase of Approximately 328 Grams of Methamphetamine from TORRES**

40.  On February 20, 2021, at my direction, the CI texted TORRES at cell phone number (805) 452-7997.  During the recorded communication, the CI and TORRES made plans to meet in Santa Barbara, CA, to conduct a narcotics deal on February 22, 2021. Following this, the CI contacted me, and told me about his/her communications with TORRES.  Additionally, I have reviewed the text messages exchanged between the CI and TORRES, and learned that on February 22, 2021, TORRES initiated a text message conversation with the CI via cell phone number (805) 452-7997. TORRES confirmed with the CI, in substance and in part, that the narcotics deal scheduled for later that day was still happening. TORRES then told the CI to come to the same location as the previous narcotics deal (in the area of SUBJECT PREMISES 1). Following this, the CI contacted me and told me about his/her conversation with TORRES.

41.  After speaking with ATF SAs Traverso, Chan, Detectives DeBarge, DiPinto, McCormick, and Sergeant Neil Gowing, and reviewing the audio and video recordings of the deal, I learned the following series of events from the afternoon of February 22, 2021:

a.    During the afternoon of February 22, 2021, the CI met with me, SA Traverso, SA Chan, and Detective DeBarge at a

predetermined meeting location.  At the location, SA Traverso and Detective DeBarge searched the CI and the CI's vehicle for contraband, with negative results.

b.   I equipped the CI with an electronic monitoring and recording device.  I then provided the CI with government funds to purchase the methamphetamine from TORRES.  Following this, Detective DeBarge equipped the CI's vehicle with a GPS tracking device.  I then directed the CI to go to SUBJECT PREMISES 1.

c.   Following this, the CI exited the predetermined meeting location and proceeded to the transaction location at SUBJECT PREMISES 1.  At the same time, I, along with other law enforcement officers followed the CI from the predetermined meeting location to the transaction location.  Once the CI arrived at the location, SBSO personnel continued to maintain visual surveillance of the CI.

d.   Upon arriving at SUBJECT PREMISES 1, the CI texted TORRES and informed TORRES the CI was at the location. TORRES then identified the CI's vehicle and Detective Jamie Furber observed TORRES exit SUBJECT PREMISES 1 with an unidentified female.  Detective Furber then observed TORRES enter the CI's vehicle, without stopping at any other locations, while the unidentified female entered a white 2002 Ford SUV. Sergeant Gowing then observed the CI drive to the corner of North Alisos Street and Gutierrez Street.

e.   At this location, based upon what I observed while monitoring and reviewing the recordings, TORRES handed the

19

CI a brown cardboard box containing methamphetamine, which was in a plastic bag, after which the CI handed TORRES $3,200 in government funds.  TORRES then proceeded to count out the funds in his hands.  After this, the CI and TORRES discussed, in substance and in part, the possibility of future narcotics transactions, including the CI purchasing methamphetamine at a lower price from TORRES.  When the CI stated he/she could probably get a pound of methamphetamine in Los Angeles for $2,600, TORRES replied, in substance and in part, that was "the lowest I'm gonna probably let it go."  TORRES then stated, "the more you come, the lower the price."  When the CI suggested purchasing two pounds of methamphetamine from TORRES in the future, TORRES replied, "25 a piece."  Based upon my training and experience, I believe TORRES meant that he would sell the CI methamphetamine for $2,500 per pound.  TORRES further stated, in substance and in part, he was an "entrepreneur" and sold cell phones, watches, and had his "hands on a few other moneymakers."

       f.   Following this, Sergeant Gowing observed TORRES exit the CI's vehicle and enter the SUBJECT VEHICLE with the unidentified female.  Detective DiPinto then observed TORRES and the unidentified female drive to Best Buy in Goleta in the SUBJECT VEHICLE.

42.  The CI then drove away and returned to the predetermined meeting location.  I, along with other law enforcement officers followed the CI back to a predetermined meeting location.

43.   At the meeting location, I took the methamphetamine from the CI and placed it into ATF custody.  I then weighed the methamphetamine in its innermost packaging and determined it to weigh approximately 351 grams.  Following this, Detective DeBarge conducted a presumptive field test of the purchased narcotics and confirmed it to be methamphetamine.  After this, I recovered the electronic monitoring and recording devices from the CI.  SA Chan searched the CI and the CI's vehicle for additional contraband with negative results.

   a.   DEA Southwest Laboratory testing has confirmed that the CI purchased approximately 328 grams of methamphetamine from TORRES.

44.   A short time later, at my direction, the CI texted TORRES.  During the recorded conversation, which I have reviewed, I learned the following:

   a.   The CI told TORRES that the CI weighed the purchased methamphetamine and it was approximately four ounces short of a pound.  After a brief conversation, TORRES offered to bring the remaining four ounces to the CI, but later agreed to make up for the shortcoming during the next transaction.  TORRES then asked the CI if he/she could download the encrypted messaging application Signal.

   **E.   March 2, 2021 Purchase of Approximately 534 Grams of Methamphetamine from TORRES**

45.   On February 26, 2021, in a recorded text message, which I have reviewed, TORRES provided the CI with a code to join a Signal messaging application chat with TORRES.

46.   Later, on the same day, at my direction, the CI texted
TORRES on the Signal messaging application.  During this
conversation, which I have reviewed, TORRES, with a Signal
username of "Karo Quintero," told the CI he had the "shirt" the
CI was owed.  Based on my training and experience, I believe
TORRES was using coded language to say TORRES had the remaining
methamphetamine he owed to the CI from the February 22, 2021
deal.  The CI then asked TORRES if he had any firearms available
for sale, but TORRES replied firearms were "hard to kome akross
(sic).³"  TORRES further stated, in substance and in part, that
he had "a bunch of food for them. Just not the dogs."  Based on
my training and experience, I believe TORRES was using coded
language to say TORRES had ammunition, but no firearms.  TORRES
then stated, in substance and in part, that he "had the shirt
that was promised n a whole different outfit."  Based on my
training and experience, I believe TORRES was using coded
language to say he had the methamphetamine TORRES owed the CI
and an additional pound of methamphetamine.

47.   On February 28, 2021, at my direction, the CI texted
TORRES on the Signal messaging application.  During the
documented conversation, which I have reviewed, I learned the
following:

a.   The CI and TORRES made plans to conduct a
narcotics and ammunition transaction on Tuesday, March 2, 2021.

---

³ Based on my training, experience, and conversations with
senior investigators familiar with Santa Barbara criminal street
gangs, TORRES was replacing the letter "c" in his messages with
the letter "k" as a sign of his affiliation with the "Krazies"
gang.

TORRES agreed, in substance and in part, to sell one pound of methamphetamine to the CI for $3,000, stating he had just taken a loss and couldn't go any lower in price.  The CI inquired about the price of the ammunition TORRES previously mentioned, but TORRES did not respond to the CI's inquiry.  Instead, TORRES stated "thangs" were exclusive, but that he would put the word out for the CI and see what "blows bakk" [sic] that week.  Based on my training and experience, I believe TORRES was using coded language to mean firearms were difficult to obtain.

48.  On March 2, 2021, at my direction, the CI texted TORRES on the Signal messaging application.  During the conversation, which I have reviewed, TORRES stated, in substance and in part, that he "might have some good news," which I believe based on my training and experience means that TORRES may have a firearm or ammunition available for sale.  TORRES additionally informed the CI the planned narcotics transaction that day would occur at a different location.  After exchanging a series of messages regarding the time and location of the narcotics transaction, TORRES provided the CI with an address on the 1100 Block of Punta Gorda Street in Santa Barbara, CA.

49.  After speaking with SA Chan, Detectives DeBarge, McCormick, DiPinto, Josh Cockrell, and Sgt. Gowing, and reviewing the audio and video recordings of the deal, I learned the following series of events from the afternoon of March 2, 2021:

a.  During the afternoon of March 2, 2021, the CI met with me and SA Chan at a predetermined meeting location.  At the

location, I searched the CI and the CI's vehicle for contraband, with negative results.  Next, SA Chan equipped the CI with an electronic monitoring and recording device.  I then provided the CI with government funds to purchase the methamphetamine and potential firearm or ammunition from TORRES.  Following this, I equipped the CI's vehicle with a GPS tracking device.  I then directed the CI to go to the address on the 1100 Block on Punta Gorda Street in Santa Barbara.

b.    Following this, the CI exited the predetermined meeting location and proceeded to the address on the 1100 Block on Punta Gorda Street.  At the same time, SA Chan and I followed the CI from the predetermined meeting location to the transaction location.  Once the CI arrived at the location, SBSO personnel continued to maintain visual surveillance of the CI. During this time, Detective DiPinto observed TORRES exit the SUBJECT VEHICLE outside of SUBJECT PREMISES 1 and walk in the direction of the transaction location.

c.    Upon arriving at the prearranged location on the 1100 Block of Punta Gorda Street, the CI contacted TORRES via a Signal message and informed TORRES the CI was at the location. Detective Cockrell observed TORRES meet with two unidentified Hispanic males outside the prearranged meeting location on Punta Gorda Street, then walk northbound towards the 1200 Block of Punta Gorda Street, before entering the front passenger door of the CI's vehicle.

d.    When reviewing the recordings, I learned the following:

24

           i.    TORRES, upon entering the CI's vehicle, stated his associates were at his "trap pad," which I understand, based on my training, experience, and conversations with senior investigators, to be a reference to the location being a potential narcotics stash house.[4]  TORRES then directed the CI to drive to the SUBJECT VEHICLE and said the methamphetamine was in the SUBJECT VEHICLE.

           ii.   Detectives McCormick and DiPinto observed the CI drive north on Salinas Street and turn right onto Eucalyptus Hill Road.  After this, Detective DiPinto observed the CI drive up Eucalyptus Hill Road, back down to Salinas Street, and down to East Gutierrez Street, where TORRES had previously parked the SUBJECT VEHICLE.

           iii. During the recordings I monitored and reviewed, TORRES stated it had been "hot" in his area and exited the CI's vehicle.  I observed TORRES then go to the trunk of the SUBJECT VEHICLE, remove a backpack, and return to the CI's vehicle.  The CI then handed TORRES $3,000 in government funds, which TORRES proceeded to count while the CI drove to SUBJECT PREMISES 1.  While driving, TORRES added, in substance and in part, that he was a "hot fucking item right now," and was being cautious.  I heard the CI and TORRES discussing the need to be careful, and TORRES stating he was a "two-striker" (referencing California's Three Strikes sentencing law).

---

[4] As discussed below, I later determined the location of this "trap pad" to be SUBJECT PREMISES 2.

iv.   After this, in the recordings I reviewed, TORRES placed a bag containing methamphetamine in the backseat of the CI's vehicle and said he weighed the product himself. The CI then discussed potentially assembling a robbery crew with TORRES, to which TORRES asked if he could "bring my own equipment."  TORRES then said, in substance and in part, that he usually conducts narcotics deals at breweries or restaurants, and that TORRES would typically hand the buyer the keys to the SUBJECT VEHICLE and tell the buyer the product is in the trunk of the SUBJECT VEHICLE.  TORRES further said, in substance and in part, the police caught him before in the area of his residence, and the police then searched his house (SUBJECT PREMISES 1) at the same time.

50.  Shortly after this, TORRES exited the CI's vehicle in the area of SUBJECT PREMISES 1.  The CI then departed the area and returned to the predetermined meeting location.

51.  After the CI exited the area of SUBJECT PREMISES 1, I along with other law enforcement officers, SA Chan, and Detective DeBarge followed the CI back to a predetermined meeting location.

52.  At the meeting location, I took the methamphetamine from the CI and placed it into ATF custody.  I then weighed the methamphetamine in its innermost packaging and determined one package to weigh approximately 113 grams and the other to weigh approximately 454 grams.  Following this, I recovered the electronic monitoring and recording devices from the CI.

Detective DeBarge then searched the CI and I searched the CI's vehicle for additional contraband with negative results.

      a.   DEA Southwest Laboratory testing has confirmed that the CI purchased approximately 534 grams of methamphetamine from TORRES.

**F.    March 16, 2021 Installation of a Pole Camera on Punta Gorda Street**

53.   On March 16, 2021, I, along with other SAs, installed a pole camera on the 1200 Block of Punta Gorda Street in Santa Barbara, CA.  After monitoring and reviewing the video footage from the camera from March 16 to April 13, 2021, I observed the following:

      a.   TORRES often entered the Holiday Mobile Home Park located at 1212 Punta Gorda Street in the SUBJECT VEHICLE or on foot.  I primarily observed TORRES enter the mobile park approximately between the late afternoon and early morning hours from March 16 to April 13, 2021 on numerous occasions.  TORRES would often park the SUBJECT VEHICLE at 1220 Punta Gorda Street and walk up the driveway into 1212 Punta Gorda Street, or drive into 1212 Punta Gorda Street and park out of view of the camera.

**G.    April 28, 2021 Surveillance of TORRES and the SUBJECT VEHICLE**

54.   On March 26, 2021, the Honorable Louise A. LaMothe, United States Magistrate Judge, issued a warrant in case number 2:21-MJ-01482 authorizing the government to install a GPS tracking device on the SUBJECT VEHICLE.  On March 31, 2021, I, along with other SAs, installed a GPS tracking device on the SUBJECT VEHICLE to supplement the pole camera on the 1200 Block

of Punta Gorda Street.  Based upon information from the GPS tracking device and pole camera, I determined TORRES drove the SUBJECT VEHICLE from SUBJECT PREMISES 1 to the area of 1212 Punta Gorda Street as frequently as multiple times a day.

55.  On April 28, 2021, I conducted surveillance in the area of 1212 Punta Gorda Street in Santa Barbara, CA.  During the surveillance, I observed the following:

a.  At approximately 1815 hours, I, using GPS data from the tracking device I previously attached to the SUBJECT VEHICLE, established surveillance on the SUBJECT VEHICLE.  Upon establishing surveillance, I observed the SUBJECT VEHICLE parked in front of SUBJECT PREMISES 1.

b.  At approximately 1930 hours, using GPS data, I determined the SUBJECT VEHICLE left the area of SUBJECT PREMISES 1.

c.  At approximately 1952 hours, using GPS data, I determined the SUBJECT VEHICLE entered the Holiday Mobile Home Park located at 1212 Punta Gorda Street in Santa Barbara, CA.

d.  At approximately 1954 hours, I observed the SUBJECT VEHICLE parked in front of a mobile home with white and gray-colored siding, and red-colored coverings over the windows (I later determined this to be mobile home space 13 – SUBJECT PREMISES 2).  I then observed TORRES, wearing a white baseball hat, dark shirt, and white socks, walk from his vehicle, up the front porch of the white and gray mobile home, and enter the front door of SUBJECT PREMISES 2.

28

e.   At approximately 2041 hours, I observed TORRES exit the front of the mobile home located at space 13 (SUBJECT PREMISES 2) with an unknown female.  I then observed TORRES enter the driver's seat of the SUBJECT VEHICLE, while the unknown female entered the passenger seat.  I terminated surveillance shortly after.

56.  On April 29, 2021, I conducted surveillance on SUBJECT PREMISES 2.  During the surveillance, I observed the following:

a.   At approximately 0900 hours I observed a mobile home with white and gray-colored sidings and red-colored coverings over the windows.  I also observed the number '13' posted on an electricity meter in front of SUBJECT PREMISES 2. I terminated surveillance shortly after.

**H.   Continued GPS Tracking of the SUBJECT VEHICLE and Investigation into SUBJECT PREMISES 1 and SUBJECT PREMISES 2**

57.  On May 5, 2021, the Honorable Alka Sagar, United States Magistrate Judge, issued an order in the same case continuing the tracking device on the SUBJECT VEHICLE for an additional 45 days.  The GPS tracking device on the SUBJECT VEHICLE shows that TORRES has continued to drive to the area of SUBJECT PREMISES 2.  For example, the SUBJECT VEHICLE entered and exited a Geofenced area of about 100-300 meters around SUBJECT PREMISES 2 the following times between May 18 and May 25, 2021:

| DATE | ENTERED | EXITED |
|------|---------|--------|
| 5/18/21 | 4:15 p.m. | 4:29 p.m. |
| 5/18/21 | 6:30 p.m. | 8:08 p.m. |
| 5/19/21 | 3:59 a.m. | 6:13 a.m. |

| 5/19/21 | 2:02 p.m. | 2:54 p.m. |
| 5/19/21 | 11:13 p.m. | 11:19 p.m. |
| 5/19/21 | 11:29 p.m. | 12:07 a.m. (next day) |
| 5/20/21 | 6:41 p.m. | 7:20 p.m. |
| 5/21/21 | 12:08 a.m. | 2:50 a.m. |
| 5/21/21 | 11:02 a.m. | 11:54 a.m. |
| 5/21/21 | 5:15 p.m. | 6:09 p.m. |
| 5/21/21 | 7:03 p.m. | 7:30 p.m. |
| 5/22/21 | 2:30 a.m. | 4:51 a.m. |
| 5/22/21 | 17:23 p.m. | 5:46 p.m. |
| 5/23/21 | 1:29 a.m. | 2:16 a.m. |
| 5/23/21 | 11:24 a.m. | 12:11 p.m. |
| 5/23/21 | 5:31 p.m. | 6:16 p.m. |
| 5/24/21 | 12:22 a.m. | 1:03 a.m. |
| 5/25/21 | 2:08 a.m. | 2:58 a.m. |
| 5/25/21 | 4:12 a.m. | 7:06 a.m. |
| 5/25/21 | 7:55 p.m. | 8:05 p.m. |

58.  On May 10, 2021, I spoke with TORRES' parole officer, who informed me that TORRES resides in a multi-family residence at 1029 East Gutierrez Street in Santa Barbara (SUBJECT PREMISES 1).  TORRES' parole officer told me that TORRES specifically resides in the part of the building that is located below street level, and that the entrance to TORRES' residence is located at the bottom of the driveway.  (The house also has another unit at street level, directly above TORRES' residence, which has another entrance.)

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

59.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences, stash houses, and vehicles.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

31

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residences, stash houses, and vehicles.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residences, stash houses, and vehicles, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences, stash houses, and vehicles.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residences, stash houses, and vehicles, or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to

diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

### VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[5]

60.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

61.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

62.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical

35

feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

　　　　b.　　In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

　　　　c.　　The person who is in possession of a device or
has the device among his or her belongings is likely a user of
the device.  Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress TORRES' and/or CATALAN's thumb- and/or
fingers on the device(s); and (2) hold the device(s) in front of
TORRES' and/or CATALAN's face with his or her eyes open to
activate the facial-, iris-, and/or retina-recognition feature.

　　63.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

36

## VII. **CONCLUSION**

64.  For the reasons described above, there is probable cause to believe that CATALAN and TORRES have violated 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance).  Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found at or in SUBJECT PREMISES 1, SUBJECT PREMISES 2, the SUBJECT VEHICLE, and the persons of CATALAN and TORRES, as described in Attachments A-1, A-2, A-3, A-4, and A-5, respectively.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  3rd  day of
June, 2021.

_____
HONORABLE LOUISE A. LAMOTHE
UNITED STATES MAGISTRATE JUDGE